IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| iFREEDOM DIRECT CORPORATION, f/k/a New Freedom Mortgage Corporation<br><br>Plaintiff,<br><br>v.<br><br>FIRST TENNESSEE BANK NATIONAL ASSOCIATION, successor-in-interest to First Horizon Home Loan Corporation, and METLIFE BANK, NATIONAL ASSOCIATION,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION TO COMPEL DISCOVERY FROM FIRST TENNESSEE BANK**<br><br>Case No. 2:09-cv-205-TS<br><br>District Judge Ted Stewart<br><br>Magistrate Judge David Nuffer |

iFreedom Direct Corporation's (Freedom) Motion to Compel Discovery from First Tennessee Bank[1] (First Tennessee) is referred to the magistrate judge.[2] After carefully considering the filings, Freedom's Motion is GRANTED IN PART as provided herein.

## BACKGROUND

In August of 2006, First Tennessee's predecessor-in-interest First Horizon Home Loan Corporation (First Horizon) entered into an Asset Purchase Agreement with Freedom.[3] In exchange for part of Freedom's mortgage business operations and assets, First Horizon agreed, among payment of other consideration, to make annual "earnout payments" for three subsequent

---

[1] Plaintiff's Motion to Compel Against Defendant First Tennessee Bank (Motion to Compel), docket no. 38, filed April 20. 2010.

[2] Order Referring Case under 28 U.S.C. § 636 (b)(1)(A), docket no. 36, filed April 19, 2010.

[3] Amended Complaint at 3, docket no. 10, filed March 10, 2009.

years.[4] These payments were to be based on the future performance of the transferred operations.[5]

Following the economic downturn of 2007 and the accompanying mortgage crisis, First Tennessee agreed to sell a substantial portion of its assets to MetLife Bank, National Association (MetLife),[6] including the servicing rights for mortgage loans worth $20 billion.[7] The operations First Horizon obtained from Freedom were among those First Tennessee sold to MetLife,[8] but comprised only approximately 3% of the First Tennessee – MetLife transaction.[9]



---

[4] *Id*; the Asset Purchase Agreement between First Horizon and Freedom (Asset Purchase Agreement) at 3, 9–10 attached as Ex. A to Amended Complaint.

[5] Asset Purchase Agreement at 9–10.

[6] Amended Complaint at 6.

[7] Defendant's Memorandum in Opposition to Plaintiff's Motion to Compel Against Defendant First Tennessee Bank (Opposing Memorandum) at 3, docket no. 44, filed May 7, 2010.

[8] *Id.*

[9] Plaintiff's Reply Memorandum in Support of its Motion to Compel Against Defendant First Tennessee Bank (Reply) at 4 n.1, docket no. 45, filed May 25, 2010.

A dispute between First Tennessee and Freedom then arose over whether the original 2006 contract between Freedom and First Horizon had been breached during the First Tennessee – MetLife transaction.[10] Freedom filed suit on March 6, 2009.[11]

In the Amended Complaint, Freedom alleges that First Tennessee breached the Asset Purchase Agreement by assigning its obligations to MetLife without Freedom's consent,[12] particularly because MetLife allegedly "does not have all the necessary and appropriate licenses and authority to operate" the operations that once belonged to Freedom.[13] Freedom is also suing because First Tennessee failed to provide Freedom with information concerning the calculation of the earnout payments.[14] Furthermore, Freedom believes First Tennessee breached the Asset Purchase Agreement by deliberately decreasing earnings from the acquired properties by increasing rates and adopting conservative underwriting guidelines in preparation for the MetLife transaction.[15] In addition to these breach of contract claims against First Tennessee, Freedom alleges First Tennessee violated its general duty of good faith and fair dealing.[16] MetLife is also a party to the suit because Freedom is suing it for tortious interference with contractual relations.[17] Both defendants denied the allegations, and First Tennessee affirmatively responded that the conservative underwriting guidelines and increased rates were necessitated by changing market conditions.[18]

---

[10] *See* Amended Complaint.

[11] Complaint, docket no. 2, filed March 6, 2009.

[12] Amended Complaint at 9.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 10.

[17] *Id.* at 12.

[18] Answer of Defendant First Tennessee Bank National Association to Plaintiff's Amended Complaint at 5, docket no. 17, filed April 20, 2009.

Freedom served Interrogatories on First Tennessee July 28, 2009, with an initial response deadline of August 31, 2009.[19] After granting First Tennessee an extension, Freedom received a response on September 14, 2009.[20] In November, First Tennessee gave Freedom over 10,000 pages of requested documents,[21] and Freedom followed up with several emails asking for more documents, commenting on the delay, and expressing that it believed First Tennessee's response to its Interrogatories had been evasive and inadequate.[22] Following First Tennessee's reply to Freedom's concerns[23] and a production of a privilege log[24] by First Tennessee in February, Freedom filed a Motion to Compel on April 20, 2010.[25]

## DISCUSSION

The appropriate scope of discovery has generated considerable contention between Freedom and First Tennessee. This is in large measure because the iFreedom-First Horizon sale was so much smaller than the subsequent First Tennessee-MetLife sale.

In its Interrogatories and Requests, Freedom has requested substantial information about the MetLife Purchase Agreement. First Tennessee responded that the MetLife Purchase Agreement was a massive contract governing a substantial portion of its assets, and that the Acquired Service Business (those business operations First Horizon obtained from Freedom in the Asset Purchase Agreement)[26] was only a small part of this larger transaction. First

---

[19] Memorandum in Support of Plaintiff's Motion to Compel Against Defendant First Tennessee Bank at 4 (Supporting Memorandum), docket no. 39, filed April 20, 2010.

[20] *Id.* at 4–5.

[21] *Id.* at 5.

[22] *Id.* at 5–6.

[23] Opposing Memorandum at 5.

[24] Supporting Memorandum at 6.

[25] Motion to Compel.

[26] According to the Asset Purchase Agreement between Freedom and First Horizon, the Acquired Service Business assets conveyed in the sale were "assets owned by Seller and used by Seller in connection with its business of

Tennessee is reluctant to produce the mountain of documents concerning the MetLife Asset Purchase Agreement because the transaction "involved numerous issues and agreements, the vast majority of which had no relation or relevance to Freedom or [its] allegations."[27] Freedom maintains, however, that "First Tennessee's transaction with MetLife is at the heart of this case, and the documents [analyzing the undertaking] are clearly relevant and discoverable."[28] The challenge for the court is to allow Freedom to fully build its case, without unnecessarily burdening First Tennessee.[29]

**Interrogatories**

<u>No. 4</u>

>Interrogatory No. 4 states:
>
>Please identify each individual and entity that, between August 2, 2006 and August 31, 2008, offered or provided any business analysis, recommendation or opinion regarding the disposition or potential disposition (via asset sale, stock sale, or otherwise) of any group or portion of First Tennessee's retail or wholesale mortgage lending operations of which the Acquired Service Business was a part, and for each such person or entity please provide a summary of his, her or its role, and identify all documents that contain or refer to any such analysis, recommendation or opinion.[30]

In Request No. 30, Freedom also requested all documents relating to any of the answers given to the interrogatories.[31]

---

providing its 'retail' residential mortgage lending services from the branch offices identified [in the contract] and its wholesale platform for mortgage services provided under the trade name 'Red Hot Funding.'" Asset Purchase Agreement at 1 attached as Ex. A to Amended Complaint.

[27] Opposing Memorandum at 9.

[28] Supporting Memorandum at 12–13.

[29] Fed. R. Civ. P. 26(c)(1).

[30] First Interrogatories, Document Requests and Requests for Admission to First Tennessee Bank (Discovery Requests) at 6, attached as Ex. A to the Motion to Compel.

[31] *Id.* at 14.

First Tennessee objected to the Interrogatory, stating that it was "overly broad" and "unduly burdensome."[32] It did, however, give the names of its consulting firms.[33] First Tennessee responded to the related request for documents by stating that there were no responsive documents.[34] "First Tennessee is not aware of any business analysis, recommendation, or opinion offered or provided by Milestone Advisors LLC and/or UBS Investment Bank that specifically addresses the sale or potential sale of assets acquired from New Freedom."[35] Freedom found this response evasive, and complained "First Tennessee insists that it has no responsive documents that specifically 'refer to' Freedom [but] these requests by design do not merely seek the documents that refer to Freedom."[36] As First Tennessee responded, however, the "transaction with MetLife involved the sale of substantially all of First Tennessee's loan origination and servicing platforms [and] involved numerous issues and agreements, the vast majority of which had no relation or relevance to . . . the allegations made by Freedom."[37]

Given the size of the MetLife transaction and the probable plethora of papers produced in contemplation of the sale, as well as the tenuous relevance that most of these documents would have to the breach of contract alleged in Freedom's Complaint, the burden on First Tennessee in this instance is likely to outweigh any potential benefit of this discovery to Freedom's development of the case. First Tennessee will therefore not be required to further supplement its answer to Interrogatory No. 4 or produce related documents.

---

[32] Defendant First Tennessee Bank National Association's Responses to Plaintiff's First Set of Discovery Requests (Responses to Discovery Requests) at 7 & 11, attached as Ex. B attached to the Motion to Compel.

[33] *Id.* at 7.

[34] *Id.* at 8.

[35] *Id.*

[36] Supporting Memorandum at 8–9.

[37] Opposing Memorandum at 8.

Nos. 5 and 6

>Interrogatory No. 5 states:
>
>Please describe all of the market and industry-driven conditions (as alleged in paragraph 17 of your answer) to which your mortgage business responded, describe all material ways in which your mortgage business was changes [sic] in response thereto, and identify all persons who you know or believe have material knowledge or information regarding the perceived need to respond or the response that was undertaken, and identify all documents that refer to or analyze those conditions or your response thereto.[38]
>
>Interrogatory No. 6 states:
>
>Please state all material reasons why you implemented more conservative underwriting guidelines (as alleged by paragraphs 17 and 18 of your answer), describe how those guidelines changed, and identify all persons who you know or believe have material knowledge or information regarding the decision to change your underwriting guidelines or the manner in which they were changed, and identify all documents that refer to or describe the recommend [sic] or actual adoption of, or the reasons for your adoption of, any of those more conservative underwriting guidelines, including all documents that contain or summarize the guidelines both before and after those changes were adopted.[39]

In response to these interrogatories, First Tennessee described the collapse of the subprime mortgage business and resulting instability of the mortgage industry.[40] The company only identified a single individual, now employed by MetLife, whom it believed had material knowledge concerning First Tennessee's change in underwriting guidelines,[41] and indicated that identifying every individual who knew of the economic crisis and the impact that it had on First Tennessee would necessitate listing every employee of the company.[42] Freedom pressed for more information, and First Tennessee agreed to produce responsive documents as they are

---

[38] Discovery Requests at 6.

[39] *Id.* at 6–7.

[40] Responses to Discovery Requests at 8–9.

[41] *Id.* at 9.

[42] Opposing Memorandum at 10.

recovered from the "archived/legacy systems."[43] In particular, First Tennessee announced it had "obtained access to a preserved version of [First Horizon's] intranet containing underwriting guidelines from the 2008 time period."[44] In its reply, Freedom continued to express concern that First Tennessee's promise was a "red herring" and that many relevant documents should be readily available outside the archived/legacy systems.[45] Freedom also stressed that seeing the underwriting guidelines from 2008 alone would not be adequate,[46] because First Tennessee admits that the earnout payments decreased between 2006 and 2008 with the adoption of more conservative underwriting guidelines.[47] In order to see these changes, Freedom will need access to underwriting guidelines from more than one year.

First Tennessee will be required to deliver the requested documents, including outside analysis and internal memos as well as e-mails, and the underwriting guidelines for 2006, 2007, and 2008.

No. 8

Interrogatory No. 8 states:

Please state each material reason why First Tennessee decided to sell, transfer or assign all or any portion of the Acquired Service Business, and identify all persons who you know or believe have material knowledge or had material input regarding that decision, and identify all documents that contain or refer to any such reasons.[48]

---

[43] *Id.* at 11.

[44] *Id.*

[45] Reply at 5.

[46] *Id.*

[47] Answer to Complaint at 5.

[48] Discovery Requests at 7.

In responding to the interrogatory, First Tennessee explained its need to downsize following the economic downturn and named many people involved in that decision.[49] It also responded, however, that no documents state why First Tennessee sold the specific assets acquired from Freedom.[50] Freedom was unsatisfied with this response, saying that "the interrogatory asks for the reasons why First Tennessee sold its business operations to MetLife, of which the Acquired Service Business was only a part."[51] First Tennessee replied that, according to a plain reading, the interrogatory is specifically asking only for reasons related to the Acquired Service Business.[52]

If Freedom's interpretation of the interrogatory is correct, the request is overly broad. First Tennessee has offered that the reason for the sale of most its business was the partial failure of the mortgage markets, which significantly impacted its business operations. To require First Tennessee to deliver every document that mentioned the need to address the crisis or that referred to the economic downturn could be very burdensome, and the potential benefit to Freedom of documents that address why First Tennessee sold assets other than those acquired from Freedom is not substantial. Therefore, First Tennessee is not required to produce every document that mentions reasons why the MetLife transaction occurred, and need not further supplement its response to Interrogatory No. 8.

---

[49] Responses to Discovery Requests at 11.
[50] Supporting Memorandum at 12.
[51] *Id.*
[52] Opposing Memorandum at 11.

9

No. 9

Interrogatory No. 9 states:

Please state the amounts of, and describe each step in your calculation of, each portion of the Earnout Payment for each Earnout Payment Period, identify all persons who you know or believe have material knowledge regarding those calculations, and identify all documents that contain or refer to any of those calculations or support any portion of those calculations.[53]

First Tennessee's response referred generally to the calculations established in the contractual agreement between First Horizon and Freedom, averring that it had followed those guidelines,[54] and identified several employees.[55] The company also gave Freedom copies of the earnout payment records, but as Freedom indicates, these were in a format which made the underlying mathematical formulae inaccessible.[56] Rather than producing Excel spreadsheets of the earnout payments, which would have enabled Freedom to examine the mathematical process by which the payment amounts were calculated, First Tennessee gave Freedom PDF images of those spreadsheets. These "snapshots" of the spreadsheets, in contrast to the Excel spreadsheets themselves, only allow Freedom to see the final earnout payment amounts and not the methods used to develop them. In its defense, First Tennessee has produced an email from Freedom prior to the production stating that the format of discovered documents was unimportant.[57] In the Interrogatories, however, Freedom specifically asked for "calculations" as well as "amounts"[58] and the PDF format does not adequately respond to this request.

---

[53] Discovery Requests at 7.

[54] Responses to Discovery Requests at 11.

[55] *Id.* at 12.

[56] Supporting Memorandum at 14.

[57] Opposing Memorandum at 13.

[58] Discovery Requests at 7.

First Tennessee argues that the calculations it used can be found in the 2006 Asset Purchase Agreement between First Horizon and Freedom.[59] Given the complexity of that contract, however, Freedom has expressed concerns that even if First Tennessee believes it is following the contractual agreements there may still be disagreement over whether the amounts were calculated correctly.[60] The court agrees.

Any increased burden on First Tennessee to produce material in electronic format which it has already delivered to Freedom in PDF format is minimal. In contrast, the calculation of the payments is particularly pertinent to this suit. The underlying mathematical steps performed in computing the earnout payments must therefore be given to Freedom in the form of native format Excel spreadsheets.

**Document Requests**

No. 9

Request No. 9 seeks production of:

The MetLife Asset Purchase Agreement, and all certificates, schedules, exhibits, contracts or agreements appended thereto or executed or delivered in connection therewith, and all drafts and non-identical versions of any of them.[61]

First Tennessee subsequently produced the final version of the MetLife Asset Purchase Agreement, but it excluded attachments, other closing documents, and drafts of the agreement.[62] It argued that such documents were not related to Freedom's Complaint and it would be unduly burdensome to produce them.[63] Freedom replied that it "is entitled to see the evolution of the

---

[59] Responses to Discovery Requests at 11.
[60] Supporting Memorandum at 14.
[61] Discovery Requests at 10.
[62] Supporting Memorandum at 15.
[63] Opposing Memorandum at 13–14.

(perhaps intentionally) nebulous language in the Asset Purchase Agreement and related documents regarding the assignment of Freedom's assets and First Tennessee's obligations to MetLife."[64]

Because the attachments and documents delivered concurrently with the MetLife Asset Purchase Agreement directly concern the dispute over whether the obligations to Freedom were assigned during the MetLife transaction, they are relevant, and their value to Freedom is likely to outweigh any burden First Tennessee might incur in producing them. Therefore, First Tennessee is required to deliver a complete version of the final MetLife Asset Purchase Agreement, including any attachments or documents delivered concurrently with the agreement.

Freedom is particularly concerned with the language of the Assignment and Assumption Agreement for Acquisition Contracts (Assignment Agreement), which is the part of the MetLife Asset Purchase Agreement dealing specifically with the assignment of First Tennessee's contractual rights and obligations.[65] These rights and obligations included the responsibilities First Tennessee owed under the Asset Purchase Agreement that First Horizon had signed with Freedom in 2006, such as the obligation to make earnout payments to Freedom.[66]

Because the Assignment Agreement directly impacted the Asset Purchase Agreement and is specifically mentioned in Freedom's Complaint,[67] First Tennessee will be expected to produce draft copies of that document. First Tennessee will not be required, however, to produce *drafts* of the entire MetLife Asset Purchase Agreement and *drafts* of its schedules and exhibits.

---

[64] Reply at 7.

[65] Amended Complaint at 6.

[66] *Id.*

[67] *Id.* at 9.

12

No. 11

Request No. 11 seeks production of:

All documents that refer to communications (including letters, e-mails, memoranda, and notes of meetings or conversations) between or among employees or representatives of First Horizon, First Tennessee, or First Horizon National Corporation regarding: (i) the MetLife Asset Purchase Agreement, or (ii) the MetLife Assignment.[68]

First Tennessee's response indicated that it would only deliver those documents that directly regarded the assets acquired from Freedom "and/or the Assignment and Assumption Agreement."[69] Freedom replied that it was willing to compromise and would only insist on the documents that specifically related to the Assignment Agreement.[70] First Tennessee maintains that "any internal communications relating to the alleged assignment have either been produced or placed on First Tennessee's Privilege Log."[71] In reply, Freedom referred to First Tennessee's claim that it already completed production and stated "[i]f that is the case, Freedom cannot find them in First Tennessee's production, and First Tennessee certainly did not identify any specific documents in its response to Freedom's motion."[72]

First Tennessee will be required to identify which documents produced in discovery respond to this specific document request, and to produce any additional internal communications relating to the Assignment Agreement.

---

[68] Discovery Requests at 10.

[69] Responses to Discovery Requests at 18.

[70] Supporting Memorandum at 16.

[71] Opposing Memorandum at 15.

[72] Reply at 7.

Nos. 12, 13, and 15

Request No. 12 seeks production of:

All documents generated after August 2, 2006 that contain or refer to any business analysis, recommendation or opinion regarding the disposition or potential disposition (via asset sale, stock sale, or otherwise) of any group or portion of First Tennessee's mortgage operations of which the Acquired Service Business was a part.[73]

Request No. 13 seeks production of:

All documents (including without limitation letters, e-mails, memoranda, presentations, minutes of boards or committees, summaries, notes, and releases to the media or investors) that contain or refer to any material reason why First Tennessee decided to sell, transfer or assign all or any portion of the Acquired Service Business, or to sell, reduce or downsize its mortgage lending business.[74]

Request No. 15 seeks production of:

All documents that contain or refer to any material business analysis, recommendation or opinion regarding the disposition or potential disposition (via asset sale, stock sale, or otherwise) of any group or portion of First Tennessee's mortgage operations of which the Acquired Service Business was a part.[75]

In response to all three requests, First Tennessee simply replied that it objected to the breadth and irrelevance of these "unduly burdensome" requests.[76] Freedom maintained that the reasons and analysis behind the MetLife Analysis were relevant to the case,[77] and First Tennessee responded by saying that there are no such documents referring specifically to the assets central to this litigation.[78] These requests mirror Interrogatory Nos. 5 and 8 and, for the reasons discussed above, impose a significant burden on First Tennessee likely to outweigh any

---

[73] Discovery Requests at 10.

[74] *Id.* at 10–11.

[75] *Id.* at 11.

[76] Responses to Discovery Requests at 18–19.

[77] Supporting Memorandum at 18.

[78] Opposing Memorandum at 15.

potential benefit to Freedom. As such, First Tennessee will not be required to produce any documents in response to these three requests.

No. 21

Request No. 21 seeks production of:

All documents that reflect, refer to, or summarize any actual or proposed changes to your retail or wholesale mortgage loan operations (as more fully referenced in Interrogatory 7) during the period between August 2006 and August 2008.[79]

Initially First Tennessee objected, not only because it considered the Request broad and burdensome, but also because "changes to your retail or wholesale mortgage operations" was vague and ambiguous.[80] Later, however, First Tennessee reconsidered and agreed to produce these documents, once they could be located in the archived/legacy systems.[81] First Tennessee will be expected to continue this endeavor and deliver the documents to Freedom in a timely manner.

**Attorney's Fees**

While Rule 37 of the Federal Rules of Civil Procedure states there are situations where a court must grant attorney's fees and expenses in relation to a motion to compel, the rule also provides that such fees "must not" be ordered if the "opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust."[82] Some of First Tennessee's complaints concerning the Interrogatories were justified. While Freedom may have understandably been frustrated by the discovery process, given the

---

[79] Discovery Requests at 12.

[80] Responses to Discovery Requests at 21.

[81] Opposing Memorandum at 15–16.

[82] Fed. R. Civ. P. 37(a)(5)(A).

15

delay on both sides and the significant number of documents First Tennessee voluntarily produced, fees and expenses will not be awarded in this instance.

**ORDER**

IT IS HEREBY ORDERED that Freedom's motion[83] to compel discovery from First Tennessee is DENIED IN PART and GRANTED IN PART. On or before July 30, 2010, First Tennessee will be required to produce the information requested in Interrogatory 9 and Request 9. Furthermore, given the agreement the parties reached on the issue, First Tennessee will also need to produce the documents related to Interrogatories 5 and 6, as well as Requests 11 and 21, by that same date. As appropriate, these documents may be governed by the protective order.[84] First Tennessee will not be required to produce documents requested in Requests 12, 13, or 15 or to further supplement its responses to Interrogatory Nos. 4 or 8.

Dated this 29th day of June, 2010.

BY THE COURT

_____
Magistrate Judge David Nuffer

---

[83]Docket no. 38.

[84] Protective Order, docket no. 33, September 24, 2009.